# ORIGINAL

FILED IN CLERK'S OFFICE
J.S.D.C.-Atlanta

MAY 22 2006

LUTHER D. THOMAS, Clerk
By: _Krutchy_
          Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| INTERCEPT, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION FILE |
| ) | |
| LUIS ENRIQUE FERNANDO ) | NO. 1 06 CV 1212 |
| MOLINA GALEANA, ) | |
| ) | **-HTW** |
| Defendant. ) | |
| ) | |

## COMPLAINT

COMES NOW Plaintiff InterCept, Inc. (hereinafter "InterCept") and makes

and files this Complaint against Defendant Luis Enrique Fernando Molina Galeana

as follows:

### PARTIES, JURISDICTION AND VENUE

1.

InterCept is a Georgia corporation with its principal place of business in

Georgia.

2.

Defendant Luis Enrique Fernando Molina Galeana (hereinafter "Defendant"

or "Dr. Molina") is, to the best of InterCept's knowledge and belief, a resident and

citizen of Mexico. As such, Dr. Molina may be served as provided under the Inter-American Convention on Letters Rogatory and Additional Protocol or personally served within the United States.

3.

Dr. Molina is subject to personal jurisdiction and venue in this Court. He has expressly agreed and consented that any suit arising out of the Guaranty Agreement (the "Guaranty," a true and correct copy of which is attached as Exhibit A) may be brought in the Northern District of Georgia. See Guaranty § 23(b), Ex. A. Dr. Molina has waived any objection to lack of personal jurisdiction or lack of venue. See id.

4.

This Court has subject matter jurisdiction over the Complaint pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00. Venue is proper pursuant to 28 U.S.C. § 1391.

## RELEVANT FACTS

5.

Media Billing, L.L.C. ("Media Billing" or the "Borrower") entered into a Member Interest Purchase Agreement (the "Purchase Agreement") dated as of

2

March 22, 2004, by and among Media Billing, Internet Billing Company, LLC and InterCept. Dr. Molina signed the Purchase Agreement as Media Billing's manager.

6.

In Section 9.13 of the Purchase Agreement, Media Billing agreed either to obtain the release by April 20, 2004 of a $3,000,000 letter of credit pledged by InterCept or to pay that sum to InterCept on or before April 22, 2004 if no draws have been made before that date (and to pay to InterCept the amount of any draw within two business days).

7.

The beneficiary of the letter of credit drew upon the letter of credit, and the bank that issued the letter of credit paid the full $3,000,000 to the beneficiary on May 12, 2004. To date, Media Billing has failed to pay the sum of $3,000,000 to InterCept as required under the Purchase Agreement.

8.

Pursuant to the Purchase Agreement, Media Billing executed and delivered to InterCept a Promissory Note (the "Media Billing Note") in the principal amount of $793,749.00. A true and correct copy of the Media Billing Note is attached as Exhibit B.

9.

The face value of the Media Billing Note was determined by a formula

specified in the Purchase Agreement as follows:

> In exchange for the Member Interest, on the Closing
> Date, Purchaser [Media Billing] shall . . . deliver to Seller
> [InterCept] a promissory note in the amount of (x)
> $754,749 *plus* (y) the amount, if any, by which the
> Estimated Working Capital Deficit of the Company is
> less than $22,000,000. . . .

Purchase Agreement, § 2.1(c). Therefore, all parties to the Purchase Agreement

understood that the principal amount of the promissory note depended on the

amount of the Estimated Working Capital Deficit. Based on the final Estimated

Working Capital Deficit, the principal amount of the Media Billing Note was

determined to be $793,749.00.

10.

Under the Media Billing Note, Media Billing agreed to pay the principal

amount plus any unpaid interest on or before March 30, 2004. See Media Billing

Note, Ex. B.

11.

To date, Media Billing has failed to pay the principal amount and interest

due on the Media Billing Note.

4

.

12.

On or about March 16, 2004, Dr. Molina executed the Guaranty Agreement and delivered the Guaranty. See Guaranty, Ex. A.

13.

The closing did not occur until March 22, 2004, when Media Billing finally paid InterCept the cash portion of the purchase price and the Estimated Working Capital Deficit of the Company was determined. The face amount of the Media Billing Note increased from the $750,000 originally estimated because the estimated liabilities assumed by Media Billing decreased.

14.

Section 1 of the Guaranty provides:

> The Guarantor hereby unconditionally, absolutely, continually, and irrevocably guarantees to the Secured Party [InterCept] the payment and performance in full of the Borrower's Liabilities (as defined below). For all purposes of this Guaranty Agreement, "Borrower's Liabilities" means the Borrower's prompt payment in full, when due in accordance with the terms of the [Media Billing] Note or declared due and at all such times, of all obligations and all other amounts, heretofore, now or at any time or times hereafter owing, arising, due or payable from the Borrower to the Secured Party pursuant to the terms of (a) the Note, including principal, interest, and expenses (including, but not limited to, reasonable attorneys' fees); and (b) the obligations of the Borrower in Section 9.13 of the Purchase Agreement.

5

Further, Dr. Molina agreed "that he is directly, and primarily liable . . . for the

Borrower's Liabilities."  Guaranty, § 1, Ex. A.

15.

The Guaranty references the Media Billing Note as having a face amount of

$750,000, which was a working amount before the final Estimated Working

Capital Deficit of the Company was determined at closing.  As noted above, the

face amount of the Media Billing Note increased from the $750,000 originally

estimated because the estimated liabilities assumed by Media Billing decreased.

16.

Solely for purposes of this lawsuit, however, InterCept is pursuing only the

face amount of the Media Billing Note as referenced in the Guaranty

($750,000.00) from Dr. Molina and not the full $793,749.00 reflected in the Media

Billing Note.

17.

By letter dated April 21, 2004 from its counsel, InterCept gave notice to Dr.

Molina through his counsel and to Media Billing that Media Billing had failed on

both of its obligations and that InterCept was exercising its rights under the

Guaranty to require Dr. Molina to pay the entire amount owed.  See Letter dated

April 21, 2004, a true and correct copy of which is attached as Exhibit C.

6

18.

In a Current Report on Form 8-K dated May 4, 2004 and filed with the U.S. Securities and Exchange Commission on May 6, 2004, Penthouse International, Inc., which owns 99% of Media Billing, confirmed, "Dr. Luis Enrique Fernando Molina Galeana, our controlling shareholder, has guaranteed the obligations of Media Billing under the Purchase Agreement, both as to payment of the Note and to the release of First Data's line of credit." See Form 8-K, a true and correct copy attached as Exhibit D.

19.

To date, Dr. Molina has not responded to InterCept's demand from April 21, 2004.

20.

To date, Dr. Molina has not paid InterCept the amount owed.

## COUNT I:  DR. MOLINA'S GUARANTY OBLIGATION FOR PAYMENT ON THE MEDIA BILLING NOTE

21.

InterCept restates and realleges Paragraphs 1 through 20 of this Complaint as if fully set forth herein.

22.

Because Media Billing has defaulted on the Media Billing Note and has failed to pay InterCept the principal and interest due on the Media Billing Note, Dr. Molina's guaranty obligation requires him to pay the amount due directly to InterCept.

23.

While InterCept believes Dr. Molina is liable for the face amount of the Media Billing Note ($793,749.00), it is only seeking the $750,000 principal amount referenced in the Guaranty, plus interest, from Dr. Molina.

24.

Interest is currently accruing on the amount owed at 12% per annum. See Guaranty, § 21, Ex. A; Media Billing Note, § 4(a) (defining "Default Rate" as simple interest rate of 12% per annum), Ex. B.

25.

As of May 17, 2004, under the Guaranty Dr. Molina owes InterCept an amount not less than $761,835.64, plus interest on the principal amount of $750,000 at the rate of $246.58 per day thereafter.

# COUNT II: DR. MOLINA'S GUARANTY OBLIGATION TO REPAY THE LETTER OF CREDIT

### 26.

InterCept restates and realleges Paragraphs 1 through 25 of this Complaint as if fully set forth herein.

### 27.

Media Billing has failed either to obtain the release by April 20, 2004 of a $3,000,000 letter of credit pledged by InterCept or to pay that sum to InterCept on or before April 22, 2004 pursuant to Section 9.13 of the Purchase Agreement.

### 28.

Interest is currently accruing on the amount owed at 12% per annum. See Guaranty, § 21, Ex. A; Media Billing Note, § 4(a) (defining "Default Rate" as simple interest rate of 12% per annum), Ex. B. Accordingly, as of May 17, 2004, Dr. Molina's guaranty obligation requires him to immediately pay the sum of $3,024,657.53, plus interest on the principal amount of $3,000,000 at the simple interest rate of 12% per annum, or $986.30 per day, thereafter.

## COUNT III: ATTORNEYS' FEES

29.

InterCept restates and realleges Paragraphs 1 through 28 of this Complaint as if fully set forth herein.

30.

Dr. Molina is liable for "all reasonable fees and expenses, including reasonable attorneys' fees" as he agreed in the Guaranty. See Guaranty, § 12, Ex. A. Dr. Molina is hereby placed on notice pursuant to O.C.G.A. § 13-1-11 that unless the full amount due and owing under the terms and conditions of the Guaranty is paid within ten days of the receipt of this notice by service of the Complaint, InterCept will enforce its rights to collect attorneys' fees and expenses pursuant to the Guaranty and any applicable law, including O.C.G.A. § 13-6-11.

WHEREFORE, InterCept prays that process issue and be served upon Defendant and that InterCept recover from Defendant the amount owed as set forth in the Complaint as follows:

1)     On Count I that the Court award damages of not less than $761,835.64, plus interest accrued on the principal amount of $750,000.00 at a rate

of 12% per annum (or $246.58 per day) for each day after May 12, 2004, against Defendant;

2)      On Count II that the Court award damages of $3,024,657.53, plus interest accrued on the principal amount of $3,000,000.00 at a rate of 12% per annum (of $986.30 per day), against Defendant;

3)      On Count III that the Court award reasonable attorneys' fees and expenses to Plaintiff pursuant to the provisions of O.C.G.A. § 13-1-11 and O.C.G.A. § 13-6-11; and

4)      That the Court award Plaintiff such other and further relief as is just and proper.

S. Wade Malone
Georgia Bar No. 468015
Rebecca B. Phalen
Georgia Bar No. 575197

Attorneys for InterCept, Inc.

NELSON MULLINS RILEY & SCARBOROUGH, L.L.P.
999 Peachtree Street, NE / 14th Floor
Atlanta, Georgia  30309-3964
(404) 817-6000
(404) 817-6050 (facsimile)

## LOCAL RULE 7.1 CERTIFICATION

Counsel certifies pursuant to Local Rule 7.1D that this Complaint was prepared using Times New Roman font (14 point type) as approved by the court in Local Rule 5.1B.

EXHIBIT / ATTACHMENT

A

(To be scanned in place of tab)



## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty Agreement"), dated as of March 22, 2004, is made by THE UNDERSIGNED (the "Guarantor") to INTERCEPT, INC., a Georgia corporation (the "Secured Party")

### Background·

A.      Pursuant to that certain Member Interest Purchase Agreement (the "Purchase Agreement"), dated as of the date hereof by and among Media Billing, L.L C., a New York limited liability company (the "Borrower"), InterCept, Inc , a Georgia corporation (the "Secured Party"), and Internet Billing Company, LLC, a Georgia limited liability company, the Borrower executed and delivered to the Secured Party that certain Promissory Note dated the date hereof in the original principal face amount of $750,000.00 (the "Note"). In addition, in the Purchase Agreement the Borrower agreed either to obtain the release by April 20, 2004 of a $3,000,000 letter of credit pledged by the Secured Party or to pay that sum to the Secured Party on or before April 22, 2004 if no draws have been made before that date (and to pay to the Secured Party the amount of any draw within two business days)  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement

B.      The Guarantor is, directly or indirectly, a holder of member interests of the Borrower and will materially benefit from the financing evidenced by the Note

C.      The Guarantor is required to enter into this Guaranty Agreement pursuant to the terms of the Purchase Agreement

D.      The execution and delivery of this Guaranty Agreement is a material part of the consideration given in connection with, and as an inducement to the execution and delivery of, the Purchase Agreement by the Secured Party, and the Secured Party is unwilling to enter into the Purchase Agreement unless the Guarantor enters into this Guaranty Agreement

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, the parties hereto agree as follows:

1.      **Guaranty.** The Guarantor hereby unconditionally, absolutely, continually, and irrevocably guarantees to the Secured Party the payment and performance in full of the Borrower's Liabilities (as defined below)  For all purposes of this Guaranty Agreement, "Borrower's Liabilities" means the Borrower's prompt payment in full, when due in accordance with the terms of the Note or declared due and at all such times, of all obligations and all other amounts, heretofore, now or at any time or times hereafter owing, arising, due or payable from the Borrower to the Secured Party pursuant to the terms of (a) the Note, including principal, interest, and expenses (including, but not limited to, reasonable attorneys' fees); and (b) the obligations of the Borrower in Section 9 13 of the Purchase Agreement.  The Guarantor's obligations to the Secured Party under this Guaranty Agreement are hereinafter referred to as the "Guarantor's Obligations."  Notwithstanding the foregoing, the liability of the Guarantor with respect to the Guarantor's Obligations shall be limited to an aggregate amount equal to the largest amount that would not render his obligations hereunder subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provisions of any applicable state law. The Guarantor agrees that he is directly and primarily liable (subject to the limitation in the immediately preceding sentence) for the Borrower's Liabilities

2.      **Payment.**      If the Borrower shall default in payment or performance of any of the Borrower's Liabilities, when and as the same shall become due, then the Guarantor will, upon demand thereof by the Secured Party, fully pay to the Secured Party, subject to any restriction on the Guarantor's Obligations set forth in <u>Section 1</u> hereof, an amount equal to all the Borrower's Liabilities then due and owing

·   3.      **Absolute Rights and Obligations**   This is a guaranty of payment and not of collection. The Guarantor's Obligations under this Guaranty Agreement shall be absolute, and unconditional irrespective of, and the Guarantor hereby expressly waives, to the extent permitted by law, any defense to his obligations under this Guaranty Agreement by reason of

(a)      any lack of legality, validity, or enforceability of the Purchase Agreement, of the Note, or of any other agreement or instrument creating, providing security for, or otherwise relating to the Guarantor's Obligations any of the Borrower's Liabilities, or any other guaranty of any of the Borrower's Liabilities (all such other agreements and instruments being collectively referred to as the "<u>Related Agreements</u>"),

(b)      any action taken under any of the Related Agreements, any exercise of any right or power therein conferred, any failure or omission to enforce any right conferred thereby, or any waiver of any covenant or condition therein provided;

(c)      any acceleration of the maturity of any of the Borrower's Liabilities, of the Guarantor's Obligations, or of any other obligations or liabilities of any Person under any of the Related Agreements;

(d)      any release, exchange, non-perfection, lapse in perfection, disposal, deterioration in value, or impairment of any security for any of the Borrower's Liabilities, for any of the Guarantor's Obligations, or for any other obligations or liabilities of any Person under any of the Related Agreements;

(e)      any dissolution of the Borrower or any other party to a Related Agreement, or the combination or consolidation of the Borrower or any other party to a Related Agreement into or with another entity or any transfer or disposition of any assets of the Borrower or the Guarantor or any other party to a Related Agreement,

(f)      any extension (including without limitation extensions of time for payment), renewal, amendment, restructuring, or restatement of, any acceptance of late or partial payments under, or any change in the amount of, the Note or any other Related Agreement, in whole or in part,

(g)      the existence, addition, modification, termination, reduction, or impairment of value, or release of any other guaranty (or security therefor) of the Borrower's Liabilities (including without limitation the Guarantor's Obligations and obligations arising under any other guaranty now or hereafter in effect);

(h)      any waiver of, forbearance or indulgence under, or other consent to any change in or departure from any term or provision contained in the Note or any other Related Agreement, including without limitation any term pertaining to the payment or performance of (x) any of the Borrower's Liabilities, (y) any of the Guarantor's Obligations, or (z) any of the obligations or liabilities of any party to any other Related Agreement;

(i)      any other circumstance whatsoever (with or without notice to or knowledge of the Guarantor) which may or might in any manner or to any extent vary the risks of the Guarantor, or

might otherwise constitute a legal or equitable defense available to, or discharge of, a surety or a guarantor including without limitation any right to require or claim that resort be had to the Borrower or to any collateral in respect of the Borrower's Liabilities or the Guarantor's Obligations, except by payment as herein provided.

It is the express purpose and intent of the parties hereto that this Guaranty Agreement and the Guarantor's Obligations hereunder shall be absolute and unconditional under any and all circumstances and shall not be discharged except by payment as herein provided.

    4.    **Currency and Funds of Payment**  All the Guarantor's Obligations will be paid in lawful currency of the United States of America and in immediately available funds, regardless of any law, regulation, or decree now or hereafter in effect that might in any manner affect the Borrower's Liabilities or the rights of the Secured Party with respect thereto as against the Borrower, or cause or permit to be invoked any alteration in the time, amount or manner of payment by the Borrower of any or all of the Borrower's Liabilities

    5.    **Events of Default.** Without limiting the provisions of Section 2 hereof, in the event that there shall occur and be continuing an Event of Default (as defined below), then notwithstanding any collateral or other security or credit support for the Borrower's Liabilities, at the Secured Party's election and without notice thereof or demand therefor, the Guarantor's Obligations shall immediately be and become due and payable  The occurrence of any of the following events shall constitute an event of default (an "Event of Default"):

    (a)    An Event of Default under Section 3(a) or Section 3(e) of the Note

    (b)    An Event of Default under Section 3(b), Section 3(c) or Section 3(d) of the Note, and the Holder thereof shall have accelerated the maturity of the Note as permitted under Section 4(a) of the Note.

    6.    **Maturity Date Extension.** The Secured Party agrees not to extend the time for final payment of the Note without the prior express written consent of the Guarantor.

    7.    **Suits.** The Guarantor from time to time shall pay to the Secured Party, on demand, at the Secured Party's place of business set forth in the Purchase Agreement or such other address as the Secured Party shall give notice of to the Guarantor, the Guarantor's Obligations as they become or are declared due in accordance with the terms of this Guaranty Agreement, and in the event such payment is not made forthwith, the Secured Party may proceed to suit against the Guarantor. At the Secured Party's election, one or more and successive or concurrent suits may be brought hereon by the Secured Party against the Guarantor, whether or not suit has been commenced against the Borrower, the Guarantor, or any other Person and whether or not the Secured Party has taken or failed to take any other action to collect all or any portion of the Borrower's Liabilities or has taken or failed to take any actions against any collateral securing payment or performance of all or any portion of the Borrower's Liabilities, and irrespective of any event, occurrence, or condition described in Section 3 hereof

    8.    **Set-Off and Waiver**  The Guarantor waives any right to assert against the Secured Party as a defense, counterclaim, set-off, recoupment or cross claim in respect of the Guarantor's Obligations, any defense (legal or equitable) or other claim which the Guarantor may now or at any time hereafter have against the Borrower or the Secured Party without waiving any additional defenses, set-offs, counterclaims, or other claims otherwise available to the Guarantor

9.    Waiver of Notice; Subrogation.

(a)    The Guarantor hereby waives to the extent permitted by law notice of the following events or occurrences  (i) acceptance of this Guaranty Agreement, (ii) the Secured Party's heretofore, now or from time to time hereafter giving or extending credit to or for the benefit of the Borrower, whether pursuant to the Purchase Agreement or the Note or any other Related Agreement or any amendments, modifications, or supplements thereto, or replacements or extensions thereof, (iii) presentment, demand, default, non-payment, partial payment, and protest, and (iv) any other event, condition, or occurrence described in Section 4 hereof  The Guarantor agrees that the Secured Party may heretofore, now or at any time hereafter do any or all of the foregoing in such manner, upon such terms and at such times as the Secured Party, in its sole and absolute discretion, deems advisable, without in any way or respect impairing, affecting, reducing, or releasing the Guarantor from its Guarantor's Obligations, and the Guarantor hereby consents to each and all of the foregoing events or occurrences

(b)    The Guarantor hereby agrees that payment or performance by the Guarantor of its Guarantor's Obligations under this Guaranty Agreement may be enforced by the Secured Party upon demand by the Secured Party to the Guarantor without the Secured Party being required, the Guarantor expressly waiving to the extent permitted by law any right it may have to require the Secured Party, to (i) prosecute collection or seek to enforce or resort to any remedies against the Borrower or any other guarantor of the Borrower's Liabilities, or (ii) seek to enforce or resort to any remedies with respect to any security interests, Liens, or encumbrances granted to the Secured Party or other party to a Related Agreement by the Borrower, or any other Person on account of the Borrower's Liabilities or any guaranty thereof.

(c)    The Guarantor further agrees with respect to this Guaranty Agreement that the Guarantor shall have no right of subrogation, reimbursement, contribution or indemnity, nor any right of recourse to security for the Borrower's Liabilities unless and until ninety-three (93) days immediately following the "Termination Date" (being the date that the Note shall have been fully, finally and irrevocably paid and satisfied in full) shall have elapsed without the filing or commencement, by or against the Borrower or Guarantor, of any state or federal action, suit, petition, or proceeding seeking any reorganization, liquidation, or other relief or arrangement in respect of creditors of, or the appointment of a receiver, liquidator, trustee, or conservator in respect to, such Person or its or his assets. This waiver is expressly intended to prevent the existence of any claim in respect to such subrogation, reimbursement, contribution, or indemnity by the Guarantor against the estate of any other Borrower within the meaning of Section 101 of the Bankruptcy Code, in the event of a subsequent case involving any other Borrower. If an amount shall be paid to the Guarantor on account of such rights at any time prior to termination of this Guaranty Agreement in accordance with the provisions of Section 20 hereof, such amount shall be held in trust for the benefit of the Secured Party and shall forthwith be paid to the Secured Party, to be credited and applied upon the Guarantor's Obligations  The agreements in this subsection shall survive repayment of all of the Guarantor's Obligations, the termination or expiration of this Guaranty Agreement in any manner, including but not limited to termination in accordance with Section 20 hereof, and occurrence of the Termination Date

10.    Effectiveness; Enforceability  This Guaranty Agreement shall be effective as of the date first above written and shall continue in full force and effect until termination in accordance with Section 20 hereof. Any claim or claims that the Secured Party may at any time hereafter have against the Guarantor under this Guaranty Agreement may be asserted by the Secured Party by written notice directed to the Guarantor in accordance with Section 22 hereof

11.    Representations and Warranties  The Guarantor warrants and represents to the Secured Party that this Guaranty Agreement has been duly executed and delivered by the Guarantor  The

4

Guarantor warrants and represents to the Secured Party that the Guarantor's execution, delivery and performance of this Guaranty Agreement does not violate or constitute a breach of any agreement or instrument to which the Guarantor is a party, or any law, order, regulation, decree or award of any governmental authority or arbitral body to which the Guarantor or the Guarantor's properties or operations is subject, and that this Guaranty Agreement is legal, valid, binding, and enforceable against the Guarantor in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles

12.    **Expenses** The Guarantor agrees to be solely liable for the payment of all reasonable fees and expenses, including reasonable attorneys' fees, incurred by the Secured Party in connection with the enforcement of this Guaranty Agreement, whether or not suit be brought.

13.    **Reinstatement.** The Guarantor agrees that this Guaranty Agreement shall continue to be effective or be reinstated, as the case may be, at any time payment received by the Secured Party in respect of any Borrower's Liabilities is rescinded or must be restored for any reason, or is repaid by the Secured Party in whole or in part in good faith settlement of any pending or threatened avoidance claim.

14.    **Reliance.** The Guarantor represents and warrants to the Secured Party that: (a) the Guarantor has adequate means to obtain on a continuing basis (i) from the Borrower, material information concerning the Borrower and the Borrower's financial condition and affairs and (ii) from other reliable sources, such other information as the Guarantor deems material in deciding to provide this Guaranty Agreement ("Other Information"), and has full and complete access to the Borrower's books and records and to such Other Information; (b) the Guarantor is not relying on the Secured Party or its employees, directors, agents, or other representatives or Affiliates, to provide any such information, now or in the future, (c) the Guarantor has been furnished with and reviewed the terms of the Purchase Agreement, the Note and the other Related Documents, is executing this Guaranty Agreement freely and deliberately, and understands the obligations and financial risk undertaken by providing this Guaranty Agreement, (d) the Guarantor has relied solely on the Guarantor's own independent investigation, appraisal, and analysis of the Borrower, the Borrower's financial condition and affairs, the "Other Information," and such other matters as the Guarantor deems material in deciding to provide this Guaranty Agreement and is fully aware of the same; and (e) the Guarantor has not depended or relied on the Secured Party or its employees, directors, agents, or other representatives or Affiliates, for any information whatsoever concerning the Borrower or the Borrower's financial condition and affairs or any other matters material to the Guarantor's decision to provide this Guaranty Agreement, or for any counseling, guidance, or special consideration or any promise therefor with respect to such decision. The Guarantor agrees that the Secured Party has no duty or responsibility whatsoever, now or in the future, to provide to the Guarantor any information concerning the Borrower or the Borrower's financial condition and affairs, or any Other Information, other than as expressly provided herein, and that, if the Guarantor receives any such information from the Secured Party or its employees, directors, agents, or other representatives or Affiliates, the Guarantor will independently verify the information and will not rely on the Secured Party or its employees, directors, agents, or other representatives or Affiliates, with respect to such information.

15.    **Survival** Subject to <u>Section 20</u>, all representations and warranties contained herein shall survive the delivery of documents and any extension of credit referred to herein or guaranteed hereby

16.    **Entire Agreement.** This Guaranty Agreement, together with the Purchase Agreement, the Note, and the other Related Documents, constitutes and expresses the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior negotiations, agreements, understandings, inducements, commitments, or conditions, express or implied, oral or written, except as herein contained   The express terms hereof control and supersede any course of

performance or usage of the trade inconsistent with any of the terms hereof  Neither this Guaranty
Agreement nor any portion or provision hereof may be changed, altered, modified, supplemented,
discharged, canceled, terminated, or amended orally

17.   **Binding Agreement; Assignment**  This Guaranty Agreement and the terms, covenants,
and conditions hereof, shall be binding upon and inure to the benefit of the parties hereto, and to their
respective heirs  legal representatives, successors, and assigns. provided, however, that the Guarantor
shall not be permitted to assign any of the Guarantor's rights, powers, duties, or obligations under this
Guaranty Agreement or any other interest herein without the prior written consent of the Secured Party
All references herein to the Secured Party shall include any successor thereof

18.   **Severability.**  The provisions of this Guaranty Agreement are independent of and
separable from each other  If any provision hereof shall for any reason be held invalid or unenforceable,
such invalidity or unenforceability shall not affect the validity or enforceability of any other provision
hereof, but this Guaranty Agreement shall be construed as if such invalid or unenforceable provision had
never been contained herein.

19.   **Counterparts.**  This Guaranty Agreement may be executed in any number of
counterparts each of which when so executed and delivered shall be deemed an original, and it shall not
be necessary in making proof of this Guaranty Agreement to produce or account for more than one such
counterpart executed by the Guarantor

20.   **Termination.**  Subject to Section 9(c) and to reinstatement pursuant to Section 13 hereof,
this Guaranty Agreement, and all of the Guarantor's Obligations hereunder (excluding those Guarantor's
Obligations relating to Borrower's Liabilities that expressly survive such termination) shall terminate on
the Termination Date.

21.   **Remedies Cumulative; Late Payments.**  All remedies hereunder are cumulative and are
not exclusive of any other rights and remedies of the Secured Party provided by law or under the Purchase
Agreement, the Note, the Related Documents, or other applicable agreements or instruments.  The
extension of the financing evidenced by the Note shall be conclusively presumed to have been extended
in reliance upon the Guarantor's guaranty of the Borrower's Liabilities pursuant to the terms hereof  Any
amounts not paid when due under this Guaranty Agreement shall bear interest at the Default Rate

22.   **Notices.**  Any notice or other communication required or permitted to be given hereunder
shall be in writing and shall be mailed by certified mail, return receipt requested, or by Federal Express,
Express Mail or similar overnight delivery or courier service or delivered (in person or by telecopy, telex
or similar telecommunications equipment) against receipt to the party to whom it is to be given, (i) if to
the Guarantor, at his respective address as set forth below his signature, (ii) if to the Secured Party, at
3150 Holcomb Bridge Road, Suite 200, Norcross, GA 30071, or (iii) in either case, to such other address
as the party shall have furnished in writing in accordance with the provisions of this Section 22  Any
notice or other communication given by certified mail shall be deemed given at the time of certification
thereof, except for a notice changing a party's address, which shall be deemed given at the time of receipt
thereof.  Any notice given by other means permitted by this Section 22 shall be deemed given at the time
of receipt thereof.

23.   **Governing Law; Venue; Waiver of Jury Trial.**

(a)   THIS GUARANTY AGREEMENT SHALL BE GOVERNED BY, AND
CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF GEORGIA
APPLICABLE TO CONTRACTS EXECUTED, AND TO BE FULLY PERFORMED, IN SUCH

STATE.

    (b)    THE GUARANTOR HEREBY EXPRESSLY AND IRREVOCABLY AGREES AND CONSENTS THAT ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN MAY BE BROUGHT IN THE COURTS OF THE STATE OF GEORGIA SITTING IN ATLANTA OR OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF SUCH STATE AND, BY THE EXECUTION AND DELIVERY OF THIS GUARANTY AGREEMENT, THE GUARANTOR EXPRESSLY WAIVES ANY OBJECTION THAT THE GUARANTOR MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE IN, OR TO THE EXERCISE OF JURISDICTION OVER THE GUARANTOR AND THE GUARANTOR'S PROPERTY BY, ANY SUCH COURT IN ANY SUCH SUIT, ACTION. OR PROCEEDING, AND THE GUARANTOR HEREBY IRREVOCABLY SUBMITS GENERALLY AND UNCONDITIONALLY TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

    (c)    NOTHING CONTAINED IN SUBSECTION (b) HEREOF SHALL PRECLUDE THE SECURED PARTY FROM BRINGING ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY AGREEMENT IN THE COURTS OF ANY JURISDICTION WHERE THE GUARANTOR OR ANY OF THE GUARANTOR'S PROPERTY OR ASSETS MAY BE FOUND OR LOCATED. TO THE EXTENT PERMITTED BY THE APPLICABLE LAWS OF ANY SUCH JURISDICTION, THE GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT AND EXPRESSLY WAIVES, IN RESPECT OF ANY SUCH SUIT, ACTION. OR PROCEEDING, OBJECTION TO THE EXERCISE OF JURISDICTION OVER THE GUARANTOR AND THE GUARANTOR'S PROPERTY BY ANY SUCH OTHER COURT OR COURTS THAT NOW OR HEREAFTER MAY BE AVAILABLE UNDER APPLICABLE LAW.

    (d)    IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER OR RELATED TO THIS GUARANTY AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT, OR AGREEMENT DELIVERED OR THAT MAY IN THE FUTURE BE DELIVERED IN CONNECTION THEREWITH, THE GUARANTOR AND THE SECURED PARTY HEREBY AGREE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THAT ANY SUCH ACTION, SUIT, OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY AND HEREBY IRREVOCABLY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT ANY SUCH PERSON MAY HAVE TO TRIAL BY JURY IN ANY SUCH ACTION, SUIT, OR PROCEEDING.

    (e)    THE GUARANTOR HEREBY EXPRESSLY WAIVES ANY OBJECTION THE GUARANTOR MAY HAVE THAT ANY COURT TO WHOSE JURISDICTION THE GUARANTOR HAS SUBMITTED PURSUANT TO THE TERMS HEREOF IS AN INCONVENIENT FORUM.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Guaranty Agreement as of the day and year first written above.

## GUARANTOR:

_____

Signature

Name. _____

Address: _____

_____

_____

## SECURED PARTY:

**INTERCEPT, INC.**

By.     _____

Name  _____Scott R Mielff_____

Title.  _____Chief Financial Officer_____

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Guaranty
Agreement as of the day and year first written above.

**GUARANTOR**

_____
Signature

Name   _Luis  Enrique  Molina_____
Address _____

_____

_____

**SECURED PARTY:**

INTERCEPT, INC.

By    _____
Name  _____
Title _____

8



# EXHIBIT / ATTACHMENT

# B

(To be scanned in place of tab)

# PROMISSORY NOTE

## Media Billing, LLC

$793,749.00

March 22, 2004
Atlanta, Georgia

Media Billing, L.L.C., a New York limited liability company (the "Borrower"), for value received, hereby promises to pay to InterCept, Inc., with an address at 3150 Holcomb Bridge Road, Suite 200, Norcross, GA 30071 (collectively with any successor or assignee, the "Holder"), the principal amount of SEVEN HUNDRED AND NINETY-THREE THOUSAND SEVEN HUNDRED AND FORTY-NINE DOLLARS ($793,749.00) on the Maturity Date (as defined below), in a single payment of all outstanding principal plus accrued and unpaid interest at the simple interest rate of eight percent (8.0%) per annum (the "Interest Rate"), from the date written above until paid.

All agreements made in this Promissory Note (this "Note") are expressly limited so that in no event whatsoever, whether by reason of advancement of proceeds hereof, acceleration of maturity of the unpaid balance hereof or otherwise, shall the interest paid or agreed to be paid to the Holder for the use of the money advanced or to be advanced hereunder exceed the maximum rate permitted by law (the "Maximum Rate"). If, for any circumstances whatsoever, the fulfillment of any provision of this Note or any other agreement or instrument now or hereafter evidencing, securing or in any way relating to the debt evidenced hereby shall involve the payment of interest in excess of the Maximum Rate, then, *ipso facto*, the obligation to pay interest hereunder shall be reduced to the Maximum Rate; and if for any circumstance whatsoever, the Holder shall ever receive interest, the amount of which would exceed the amount collectible at the Maximum Rate, such amount as would be excessive interest shall be applied to the reduction of the principal balance remaining unpaid hereunder and not to the payment of interest. This provision shall control every other provision in any and all other agreements and instruments existing or hereafter arising between the Borrower and the Holder with respect to the debt evidenced hereby.

1.    **Payment.**

(a)    Subject to Section 4 hereof, principal of, and any accrued and unpaid interest on, this Note shall be due and payable in full on March 30, 2004 (the "Maturity Date"). Time is of the essence of this Note.

(b)    Interest on this Note shall accrue at the Interest Rate from the date hereof, and shall be payable in arrears on the Maturity Date.

(c)    The Borrower may, at its option, prepay the principal of this Note, in whole or in part, plus all accrued interest thereon, without payment of any premium or penalty, by giving written notice thereof to the Holder at least one (1) day prior to the date selected for prepayment. Prepayments shall be made to the Holder as provided in the following paragraph.

(d)      Payment of principal and interest on this Note shall be made by wire transfer to the Holder.

(e)      The obligations to make the payments provided for in this Note are absolute and unconditional and not subject to any defense, set-off, counterclaim, rescission, recoupment or adjustment whatsoever   The Borrower hereby expressly waives demand and presentment for payment, notice of non-payment, notice of dishonor, protest, notice of protest and diligence in taking any action to collect any amount called for hereunder, and shall be directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission with respect to the collection of any amount called for hereunder.

2.      **Covenants.** The Borrower hereby covenants and agrees with the Holder that, so long as any amount remains unpaid on this Note, the Borrower shall deliver to the Holder:

(i)      promptly after the Borrower shall obtain actual knowledge of such, written notice of all legal or arbitral proceedings, and of all proceedings by or before any governmental or regulatory authority or agency, and each material development in respect of such legal or other proceedings, materially affecting the Borrower; and

(ii)     promptly after the Borrower shall obtain actual knowledge of the occurrence of any Event of Default (as hereinafter defined) or any event which with notice or lapse of time or both would become an Event of Default (an Event of Default or such other event being a "Default"), a notice specifying that such notice is a "Notice of Default" and describing such Default in reasonable detail, and, in such Notice of Default or as soon thereafter as practicable, a description of the action the Borrower has taken or proposes to take with respect thereto.

3.      **Events of Default.**

The occurrence of any of the following events shall constitute an event of default (an "Event of Default"):

(a)      A default in the payment of the principal or interest on this Note, when and as the same shall become due and payable.

(b)      A default in the performance, or a breach, of any other covenant or agreement of the Borrower in this Note and continuance of such default or breach for a period of fifteen (15) days after receipt of notice from the Holder as to such breach or after the Borrower had actual knowledge of such breach.

(c)      A default or event of default that remains uncured following any applicable cure period shall have occurred with respect to any indebtedness for borrowed money of the Borrower in the amount of $250,000 or more and such indebtedness shall have been accelerated by its holder.

2

(

(d)     Any representation, warranty, or certification made by the Borrower in or pursuant to this Note shall prove to have been false or misleading as of the date made in any material respect

(e)     The entry of a decree or order by a court having jurisdiction adjudging the Borrower a bankrupt or insolvent, or approving a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Borrower, under federal bankruptcy law, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, and the continuance of any such decree or order unstayed and in effect for a period of 30 days; or the commencement by the Borrower of a voluntary case under federal bankruptcy law, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency, or other similar law, or the consent by the Borrower to the institution of bankruptcy or insolvency proceedings against it, or the filing by the Borrower of a petition or answer or consent seeking reorganization or relief under federal bankruptcy law or any other applicable federal or state law, or the consent by the Borrower to the filing of such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or similar official of the Borrower or of any substantial part of the property of the Borrower, or the making by the Borrower of an assignment for the benefit of creditors, or the admission by the Borrower in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by the Borrower in furtherance of any such action.

### 4.     Remedies Upon Default.

(a)     Upon the occurrence of an Event of Default referred to in Sections 3(a) or 3(e), the principal amount then outstanding of, and the accrued interest on, this Note shall become immediately due and payable without presentment, demand, protest or other formalities of any kind, all of which are hereby expressly waived by the Borrower. Upon the occurrence of an Event of Default other than ones referred to in Sections 3(a) and 3(e), the Holder may declare the principal amount then outstanding of, and the accrued interest on, this Note to be due and payable immediately, and upon such declaration the same shall become due and payable immediately, without presentation, demand, protest or other formalities of any kind, all of which are expressly waived by the Borrower. If the maturity date of this Note is accelerated as provided in this Section 4(a), this Note shall bear interest at the simple interest rate of twelve (12%) per annum (the "Default Rate"), commencing on the date of such acceleration without further notice.

(b)     Upon the occurrence and during the continuance of an Event of Default, the Holder may institute such actions or proceedings in law or equity as it shall deem expedient for the protection of its rights and may prosecute and enforce its claims against all assets of the Borrower, and in connection with any such action or proceeding shall be entitled to receive from the Borrower payment of the principal amount of this Note plus accrued interest to the date of payment plus reasonable expenses of collection, including, without limitation, reasonable attorneys' fees and expenses actually incurred.

### 5.    Miscellaneous.

(a)     Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by certified mail, return receipt requested, or by Federal Express, Express Mail or similar overnight delivery or courier service or delivered (in person or by telecopy, telex or similar telecommunications equipment) against receipt to the party to whom it is to be given, (i) if to the Borrower, at its address as set forth below its signature, Attention: President, (ii) if to the Holder, at its address set forth on the first page hereof, or (iii) in either case, to such other address as the party shall have furnished in writing in accordance with the provisions of this Section 5(a).  Any notice or other communication given by certified mail shall be deemed given at the time of certification thereof, except for a notice changing a party's address, which shall be deemed given at the time of receipt thereof.  Any notice given by other means permitted by this Section 5(a) shall be deemed given at the time of receipt thereof.

(b)     Upon receipt of evidence satisfactory to the Borrower, of the loss, theft, destruction or mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the Holder thereof that this Note has been lost, stolen, destroyed or mutilated together with an indemnity against any claim that may be made against the Borrower on account of such lost, stolen, destroyed or mutilated Note, and upon reimbursement of the Borrower's reasonable incidental expenses, the Borrower shall execute and deliver to the Holder a new Note of like date, tenor and denomination.

(c)     No failure to accelerate the indebtedness evidenced hereby by reason of an Event of Default hereunder, or other indulgences granted from time to time or course of dealing hereunder, shall be construed as a novation of this Note or as a waiver of such right of acceleration or of the right of Holder thereafter to insist upon strict compliance with the terms of this Note or to prevent the exercise of such right of acceleration or any other right granted hereunder or by applicable law.  No extension of the time for payment of the indebtedness evidenced hereby, made by agreement with any person now or hereafter liable for payment of the indebtedness evidenced hereby, shall operate to release, discharge, modify, change, or affect the original liability of the Borrower hereunder or that of any other person now or hereafter liable for payment of the indebtedness evidenced hereby, either in whole or in part, unless the Holder agrees otherwise in writing.  No right, power or remedy conferred by this Note upon the Holder shall be exclusive of any other right, power or remedy referred to herein or now or hereafter available at law, in equity, by statute or otherwise, and all such remedies may be exercised singly or concurrently

(d)     This Note may be amended only by a written instrument executed by the Borrower and the Holder.

(e)     THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF GEORGIA, EXCLUDING CHOICE OF LAW PRINCIPLES.

(f)     Any dispute, controversy or claim arising out of or relating to this Note shall be settled by binding arbitration in accordance with the commercial arbitration rules of the

4

American Arbitration Association in force at the time and place and in the manner described in Section 13.16 of that certain Member Interest Purchase Agreement, dated as of the date hereof by and among the Borrower, InterCept, Inc., and Internet Billing Company, LLC.

(g)     The Borrower irrevocably consents to the exclusive jurisdiction of the courts of the State of Georgia and of any federal court located in such State in connection with any action or proceeding arising out of or relating to this Note, any document or instrument delivered pursuant to, in connection with or simultaneously with this Note, or a breach of this Note or any such document or instrument.

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and dated the day and year first above written.

**Media Billing, L.L.C.**

By:_____

        Name. _____

        Title: _____

Address: _____

                  _____

                  _____

5

American Arbitration Association in force at the time and place and in the manner described in Section 13.16 of that certain Member Interest Purchase Agreement, dated as of the date hereof by and among the Borrower, InterCept, Inc , and Internet Billing Company, LLC

      (g)     The Borrower irrevocably consents to the exclusive jurisdiction of the courts of the State of Georgia and of any federal court located in such State in connection with any action or proceeding arising out of or relating to this Note, any document or instrument delivered pursuant to, in connection with or simultaneously with this Note, or a breach of this Note or any such document or instrument.

     IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and dated the day and year first above written.

                           Media Billing, L.L.C.

                           By:_____
                              Name:_____
                              Title:_____

                 Address:      _____
                                _____
                                _____

~ Doc# 545626 01 ~



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

**FILE COPY**

(

LAW OFFICES

NELSON MULLINS RILEY & SCARBOROUGH, L.L.P

A REGISTERED LIMITED LIABILITY PARTNERSHIP

CHARLES D VAUGHN
(404) 817-6189
INTERNET ADDRESS CDV@NMRS COM

999 PEACHTREE STREET N E
SUITE 1400
ATLANTA, GEORGIA 30309
TELEPHONE (404) 817-6000
FACSIMILE (404) 817-6050
WWW NMRS COM

OTHER OFFICES
CHARLESTON, SOUTH CAROLINA
CHARLOTTE, NORTH CAROLINA
COLUMBIA SOUTH CAROLINA
GREENVILLE SOUTH CAROLINA
MYRTLE BEACH, SOUTH CAROLINA
RALEIGH, NORTH CAROLINA
WASHINGTON, DC
WINSTON-SALEM, NORTH CAROLINA

**Certified Article Number**

7160 3901 9844 4981 0288

**SENDERS RECORD**

April 21, 2004

Via Electronic Mail and
Via Certified Mail No. 7160 3901 9844 4981 0288

Stephen A. Weiss, Esq.
Gersten Savage Kaplowitz Wolf & Marcus, LLP
101 East 52nd Street
New York, NY 10022

Dear Mr. Weiss:

I am writing to you on behalf of my client, InterCept, Inc. ("Seller"), regarding the defaults by your client, Media Billing, L.L.C. ("Purchaser"), under that certain Member Interest Purchase Agreement dated as of March 22, 2004 by and among Purchaser, Internet Billing Company, LLC (the "Company"), and InterCept. (Capitalized terms used in this letter and not otherwise defined shall have the meanings given in the Agreement.) Purchaser is presently in default in its obligations to Seller under the Agreement and the Note in at least three respects:

1.    Purchaser has failed to pay the Note in full on its scheduled maturity date of March 30, 2004. Therefore, an Event of Default occurred under the Note on that date. Purchaser now owes Seller the original principal amount of $793,749.00, plus interest at the stated rate of 8% per annum from March 22, 2004 through March 30 ($1,565 75), plus interest at the default rate of 12% per annum from March 31, 2004 through April 21, 2004 ($5,741.09), for aggregate interest of $7,306.84 and a total amount now due and payable of $801,055.84. We advise you that interest of $260.96 per day is now accruing at the default rate. *Seller hereby demands that Purchaser pay the foregoing total amount in full by wire transfer as required under the Note.*

2.    Under Section 9.13 of the Agreement, Purchaser was and remains obligated to cause First Data to release Seller's $3,000,000 letter of credit currently securing the Company's obligations under the Processing Agreements on or before April 20, 2004. Further, because the First Data Letter of Credit was not released on or before April 20, 2004,

(

Stephen A Weiss, Esq.
April 21, 2004
Page 2

Purchaser is now obligated to pay Seller $3,000,000.00 in immediately available funds. *Seller hereby demands that Purchaser do so.*

Although Seller is aware of arrangements that Purchaser apparently made with First Data last week to extend the time for replacing the First Data Letter of Credit, those arrangements in no way amend the Agreement or excuse Purchaser's failure to comply with its obligations under the Agreement.

We note further that Dr. Molina has personally guaranteed the above obligations in that certain Guaranty Agreement dated as of March 22, 2004, and we hereby notify Purchaser of Buyer's intent to exercise its rights under such Guaranty Agreement and thus to require Dr. Molina to pay the foregoing amount of $3,801,055.84.

3.     Under Section 9.1 of the Agreement, the parties to the Agreement agreed as follows:

> "9.1    **Cooperation**. The InterCept Parties on the one hand, and Purchaser on the other hand, shall cooperate fully with each other and their respective employees, legal counsel, accountants and other representatives and advisers in connection with the steps required to be taken as part of their respective obligations under this Agreement both before and after the Closing; and shall, at any time and from time to time after the Closing, upon the request of the other, do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, receipts, acknowledgments, acceptances and assurances as may be reasonably required to satisfy and perform the obligations of such party hereunder."

In that regard, since March 22, 2004, our law firm and representatives of Seller have tried repeatedly without success to obtain documents and instruments and in other ways generally to wrap up the closing as agreed by the parties. These efforts include, but are not limited to, repeated telephone calls, emails and written correspondence to Charles Samel, who undertook to respond to these requests on behalf of Purchaser but to date has not done so. We hereby demand that Purchaser comply promptly with its obligations under Section 9.1, including but not limited to providing the materials and documents requested of Mr. Samel by Scot Kees of this law firm.

Seller looks forward to prompt receipt of the funds and cooperation demanded above *If such payment and cooperation are not immediately forthcoming, Seller will take all appropriate and necessary legal action to protect its interests and enforce its rights.*

Stephen A. Weiss, Esq.
April 21, 2004
Page 3

Very truly yours,

*Charles Vaughn*

Charles D. Vaughn

CDV:rnu

**Certified Article Number**

**7160 3901 9844 4951 0721**

**SENDERS RECORD**

cc:   Media Billing, L.L.C. (via certified and electronic mail)
      Mr. Jason Galanis (via electronic mail)
      Mr. Charles Samel (via electronic mail)
      Penthouse International, Inc. (to Milton Pollard, Chairman and Acting CEO, and
         Claude Bertin, Executive Vice President)
      Dr. Luis Enrique Fernando Molina G. (via J. Antonio Ambrosi, Esq., of Baker &
         McKenzie, Mexico City, Mexico)
      Reid Breitman, Esq.
      Larry Cline, Esq., Gersten Savage Kaplowitz Wolf & Marcus, LLP
      Mr. G. Lynn Boggs
      Jonathan R. Coe, Esq.



# EXHIBIT / ATTACHMENT



_____

**(To be scanned in place of tab)**

UNITED STATE...

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934

Date of Report (Date of earliest event reported) May 4, 2004

PENTHOUSE INTERNATIONAL, INC.
(Exact name of registrant as specified in its charter)

FLORIDA                                65-1158257
-------------------------------------  -------------------------------------
     (State of incorporation)          (IRS Employer Identification No.)

2200 S.W. 10TH STREET, DEERFIELD BEACH, FLORIDA 33442
(Address of principal executive offices)

(954) 363-4400
(Registrant's telephone number)

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF
1995:

This Form 8-K contains forward-looking statements as defined by the Private
Securities Litigation Reform Act of 1995. Forward-looking statements include
statements concerning plans, objectives, goals, strategies, future events or
performance, and underlying assumptions and other statements which are other
than statements of historical facts. These statements are subject to
uncertainties and risks including, but not limited to, product and service
demand and acceptance, changes in technology, economic conditions, the impact of
competition and pricing, government regulation, and other risks defined in this
document and in statements filed from time to time with the Securities and
Exchange Commission. All readers are encouraged to review this Form 8-K. All
forward-looking statements, whether written or oral, and whether made by or on
behalf of the companies, are expressly qualified by the cautionary statements
and any other cautionary statements which may accompany the forward-looking
statements. In addition, the companies disclaim any obligation to update any
forward-looking statements to reflect events or circumstances after the date
hereof.

ITEM 5.  OTHER EVENTS

As reported on a Form 8-K filed with the Commission on April 6, 2004, our 99%
owned subsidiary Media Billing, LLC, a New York limited liability company

("Media Billing"), acquired Internet Billing Company, LLC ("iBill") from
Intercept, Inc. ("Intercept"), on March 22, 2004 pursuant to a Member Interest
Purchase Agreement entered into by the above parties dated March 16, 2004 (the
"Purchase Agreement").

As consideration for iBill, we issued a note to Intercept in the principal face
amount of $793,749 paying an interest rate of 8% (the "Note") due on March 30,
2004. The outstanding amount of the Note on April 21, 2004 was $801,055.84;
interest has been accruing at the rate of $260.96 every day thereafter.
Concurrent with the closing on March 22, 2004, we also delivered $750,000 in
cash to Intercept, $2,804,000 in cash to First Data Merchant Services ("First
Data") and we delivered an indemnification guarantee to Intercept for
post-closing liabilities ("Post-closing Liabilities"). We secured the
indemnification guarantee by delivering a two-year insurance policy to Intercept
with first-year coverage of $20,000,000. Intercept also agreed to indemnify
Media Billing for certain pre-closing liabilities. No security was provided by
Intercept to us for this indemnification guarantee.

On April 21, 2004, we received a letter from counsel to Intercept, claiming that
Media Billing was in default in payment of the Note. In addition, Intercept
claims that Media Billing has breached its obligation under the Purchase
Agreement to cause First Data to release Intercept's $3,000,000 letter of credit
with First Data on or before April 20, 2004. The release has not been obtained,
and Intercept has therefore claimed that under the Purchase Agreement Media
Billing is obligated to pay it approximately $3,800,000 in cash, inclusive of
the Note, accrued interest and penalty interest

Dr. Luis Enrique Fernando Molina G., our controlling shareholder, has guaranteed
the obligations of Media Billing under the Purchase Agreement, both as to
payment of the Note and to the release of First Data's line of credit.
Consequently, Intercept claimed that Dr. Molina has become obligated under the
Purchase Agreement to perform the obligations of Media Billing.

On April 21, 2004, Intercept received a letter from counsel of a former client
of iBill making demand for payment. The letter claims that iBill did not
properly allocate among iBill clients certain third party costs, including
Mastercard fines, and, as a result, clients of iBill may have paid a
disproportionate share of such costs as passed on by iBill. The letter also sets
forth the parties' intention to file a lawsuit and seek class action status
unless satisfactory payment arrangements can be made immediately. The damage
claims in the letter are unspecified, but indicate a potential value of eight
figures. The alleged events occurred in 2003 and are pre-closing liabilities for
which Intercept is obligated to indemnify us.

In addition, we have since the closing date of the Purchase Agreement been
advised that the Department of Justice has initiated an anti-trust inquiry of
several billing companies identified as Internet Payment Service Providers
("IPSPs"). The inquiry requires iBill and two competitors to produce information
regarding certain one-time fees that were charged to merchants by iBill and
others as a surcharge on newly imposed VISA registration fees in 2003. The
inquiry is seeking to establish whether the fee charged by the IPSPs was set as
a result of collaboration between the IPSPs and, if so, whether or not such
pricing policies may be anti-competitive. We are responding to the request for
information and will continue to cooperate with the inquiry. There can be no
determination as to whether the inquiry will result in any regulatory action.
The subject time period and events relate to 2003 activities and are
consequently Pre-Closing Liabilities for which Intercept has indemnified us
against losses, if any.

(

Inasmuch as Media  Billing and iBill are  indemnified  by InterCept  for certain
pre-closing  liabilities of InterCept or iBill, including those described above,
we intend to make an indemnification  claim to InterCept.  Since we believe that
the potential damage claims being indemnified  against may significantly  exceed
the  approximately  $3.8 million amount claimed by InterCept  under the Purchase
Agreement,  we have  taken  the  position  that  until a potential  outcome  is
determinable  or  InterCept  posts  adequate  collateral  to  secure  its
indemnification  obligations,  we will  withhold  payments  under  the  Purchase
Agreement.

We intend to negotiate a mutually  acceptable  solution to the  above-referenced
matters.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended,
the  Registrant  has duly  caused  this report to be signed on its behalf by the
undersigned hereunder duly authorized

                                        PENTHOUSE INTERNATIONAL, INC.

                                        By: /s/ CLAUDE BERTIN
                                        ------------------
                                        Claude Bertin
                                        Executive Vice President

May 6, 2004